Good morning, Your Honors. George Katsourilas on behalf of Petitioner-Appellant Novak. If I may, I would like to reserve three minutes for rebuttal, if it pleases the Court. Your Honors, I think that in analyzing the initial ineffective assistance of counsel claim in this case, where the district court went wrong was in separating trial counsel's failure to investigate the case from his erroneous advice to his client on the downside risk of going to trial. What the district court did was parse those two things out and essentially say that it was all right not to investigate the case because it was early in the case, which actually is not accurate. It was two months into the case, and to rely on solely upon statements of a prosecutor in terms of what the guideline range was and what the conceivable risk of going to trial was. If the defense counsel had investigated, as you say, and found what the final lab report showed, which was a much greater quantity of methamphetamine production, is there any possibility that the prosecutor would not have known about that final lab report at the time he gave it to defense counsel? Your Honor, there is every possibility, and here is what I'm referring to. How can he do that? Just tell me the vehicle of defense discovery that would be used to find out what the government's final lab report showed without the government's attorney finding out about that report. Your Honor, the vehicle is what's called independent investigation. If counsel had retained an expert of his own or even looked with common sense at the evidence, he would have known that that lab report had a very real possibility, if not a probability, of coming out the way that it did. My point in this case is that the preliminary lab report which buttressed a 10 to 12-year plea offer. There was no such report. The preliminary report showed a smaller amount of production. It did not, Your Honor. That is inaccurate. The district court said that. The preliminary reports showed exactly the contrary. The preliminary reports are in the excerpt of record. There was never a report that showed 10 to 12 years. What happened is that the trial prosecutor told that to defense counsel, and he relied 100 percent on those statements. There is no report in this record that says that the group of people who were in the trial had 10 to 12 years. There is. There's a report on this quantity that would be 10 to 12 years. That, no. The prosecutor said that at the bail hearing, Your Honor. There is no report in this record, and there was no report ever provided to defense counsel that talked about a quantity of 10 to 12 years. She said. I don't mean 10 to 12 years. Right. A report that talked about the quantity of the meth. Yes. There were all sorts of reports, and they were massive amounts of meth. But I thought you said there is no preliminary lab report. Would Judge Baer ask you about that? There is no preliminary lab report that indicates a quantity that would dictate a guideline range of 10 to 12 years, Your Honor. What is your contention as to what the preliminary report let's get all our facts straight. I want your contention. The preliminary report, can you give me the excerpts of record citations of that and then tell me what you think it said? Your Honor, the excerpt of record citations for the preliminary reports given to counsel are pages 1 through approximately 34. Excerpts of record? Excerpts of record. All right. What they include is the criminal complaint, which talks about a massive quantity of chemicals. No, no, no, no, no. There is no lab report. There is a report of all the chemicals. There is a statement by the chemist. There is no final lab report, Your Honor. Preliminary. Preliminary lab report. That's what I'm referring to. The preliminary lab reports are at 1 through 35 in the excerpt of record. 1 through 35 in my excerpts of record is the complaint. No, that's 1 through 10. Excuse me. 1 through 13 is the complaint in the indictment. So then your citation of 1 through 34 is an error? No, Your Honor. It includes statements from the chemist in the complaint, and then there are lab reports following that. All the way to page 34, excuse me, 35. I have an affidavit of Mr. Mancini. I'm sorry? The affidavit of Mr. Mancini. Yes, and it makes reference to ER2. It does, and Phyllis Quinn, the expert, the lab technician. And the report of investigation, page 2 of 9, lists all the matters taken and is prepared April 15, 1994, correct? Correct, Your Honor. And at page 4 of the criminal complaint is the statement from the chemist. That's why I included it in answering Your Honor's question. And where she talks about 20 to 30 gallons of a controlled substance, P2P, 20 to 30 gallons of P2P. That's what she talks about. There is no lab report justifying a guideline range of 10 to 12 and a half years. These labs are the same. Counsel, what is this on page 14 of the excerpt's record? What is that? So what your argument is, the lab report, which was actually produced, the preliminary lab report, had it been read precisely and well by defense counsel. Defense counsel would have seen that the U.S. attorney was wrong in saying that it supported only a 10 and 12-year plea and would have rushed to accept that 10 and 12-year plea. And failure to do that was an effective assistance of counsel. That's correct, Your Honor. Exactly. And to have looked, he didn't just have to look carefully at this. All he had to do was look at the pictures. All he had to do was look at the videotape of the lab. We have in this record declarations from two experienced defense lawyers functioning as experts below who have said that a cursory review of the videotape of this lab, a cursory review of what I've just pointed out to this Court, would have revealed to any lawyer paying attention that the danger of a massive guideline range well above 10 to 12 and a half years was manifest in this case. And that is my claim, Your Honor. And your claim is that had he rendered effective assistance of counsel at that time, he would have pleaded guilty to 10 or 12 years, and the only adequate remedy that this Court can give is to put him back at that position and let him plead to 10 or 12 years. It was a 10-year offer, and that is correct. A 10-year offer. That is correct. That is my position. It is also my position, and a review of this record will reveal to this Court, that counsel did none of those things. In terms of investigating the case, in terms of taking a careful look at what he had in front of him already, he did nothing. He relied on the statements of the prosecutor. He told his client that that's what he was facing. Now, in terms of prejudice, I find it unfathomable that one can say that this man never would have pleaded guilty, despite his protestations of innocence, if he had known that instead of 10 to 12 years, he was looking at 24 to 25 years, which is what he got. And I think the record is clear from the same experts to whom I referred before, and doing this for 27 years, I can say that that happens all the time. People come in all the time and say, I didn't do it, and when a lawyer says, that's fine, Madam or Sir, but if you go to trial, here's what you're looking at. And all of a sudden, everything changes. And that's what we're talking about in the Varaya v. Keene, in the Cullen case, which we've cited, the Second Circuit cases upon which this Court relied in United States v. Leontief. Briefly, on the conflict of interest claim, I think where the district court is missing the boat on that claim is that by counsel's own admission, there were things he could not do and did not do. Because he had no idea what one of his clients was saying in debriefings, who was cooperating against the very organization of which Mr. Novak was the President, and he could not pursue any disposition in which Mr. Novak would be candid about his involvement in criminal activity for fear that he might contradict his other client. That's supposing he knew what his other client was saying. The evidence is clear that defense counsel was not present at grand jury, did not know that his other client was, in a vernacular, becoming a snitch, and didn't know what the man was saying as to Novak. Don't fight the facts on that one. Well, I beg to differ in one sense, Your Honor. That's what he claimed below, and that's what the district court adopted. So I concede that. That's not what he claimed. He's not a plaintiff making an allegation. That's what he swore under oath in his testimony. That's what he testified. That is correct. What he also swore under oath, Your Honor, that he testified to is that he knew that the government would be asking Mr. Durda, his other client, about the misfits. He knew that the government regarded them as a criminal organization. He knew that Mr. Novak was alleged to be the President of the misfits. He knew that Mr. Durda would be likely to be asked about the President of this organization while he was, quote, end quote, acting as a snitch, and he knew those things were going to happen. But he didn't know he was being a snitch. Pardon me? He didn't know he was being a snitch. He absolutely knew he was being a snitch. He absolutely knew that, Your Honor. He cut a cooperation deal for him. He appeared in front of the district court and argued that he provided the most valuable cooperation in the world against the misfits. Counsel, let me ask you about your earlier argument, when you were talking about the preliminary lab report. Is that the argument you made in your opening brief? It is the argument, Your Honor. I have made that argument in my opening brief. Where did you make that precise argument in your opening brief? I thought the argument you made in your opening brief was that counsel never bothered to obtain the government's lab report. No. My argument in my opening brief was counsel never bothered to investigate. And in the statement of facts in my opening brief … Talk about the specific argument you've made here, that if counsel had looked at the preliminary lab report or the documents attached to the complaint, it would have been obvious what the amount of the drugs were. Where is that precise argument made in your brief? It is – take a look at page 16, Your Honor, where I have stated that the record includes exhibits showing a lengthy list of suspected illegal chemicals found at the lab site upon which the prosecution of the appellant was based. Right. I cite there the exact same excerpt of records. But the next paragraph you said he conducted no independent testing. You didn't say if he had looked at – a cursory look, in your words, at those documents would have informed him of the extensive time he was facing. That argument was not made in the brief. Yes, it is, Your Honor. Where? If you'll give me a moment. It is also made in the reply – worse. Well, you would say – I'm sorry. Had he reviewed the evidence or even looked carefully at the pictures and videos provided to him by the government, he would have seen a large illegal methamphetamine laboratory dating back years. What page is that? That is at page 37, Your Honor. It goes on. Had he looked at the notes found at the scene, he would have known that the lab had been What you didn't say in your brief was that he should have retained an expert. I do say that. Oh, you do. Where did you say that? I have said everything I've said today. Thank you, Your Honor. All right. We'll give you one minute for a report. Thank you. May it please the Court, my name is Phil Talbert and I represent the United States in this matter. I'll address the ineffective assistance of counsel claim and then briefly the conflict claim. Here, the record below establishes that John Berger's representation of the defendant was not ineffective because it did fall within the wide range of reasonable assistance that the law provides for. What counsel's performance should be assessed under the facts and circumstances known at the time that he was providing that assistance, not with perfect 20-20 hindsight. Well, what about his failure to account for the fact that this was a – there were potentially could be a tremendous amount of drugs involved when he gave the advice that he gave. And he gave his advice. He, in fact, when the assumption was that there was a large meth lab and then when the prosecutor first gave information that some of the substances weren't being – weren't tested out and were washed, then it looked like it was a much smaller amount. And, in fact, she stated to him and to the – to the magistrate at the detention hearing that it looked like he was looking only at the 10-year to 12-year range. But was it ineffective for him to rely on the prosecutor – prosecutor's representation rather than independently determining for himself what the potential exposure was? Well, I think there were two different issues here. One was how much meth and P2P were actually found at the lab. And I think that's what the AUSA – the trial AUSA was conveying to him was that the amount found at the lab was less than what was preliminarily thought. Yes. But was he entitled to rely on that instead of conducting an independent investigation? Was it ineffective to fail to conduct an independent investigation of that amount? Not to conduct his own independent lab testing of the actual amounts. Remember, at the time, the cooperator, Ehrig, had not yet flipped and given testimony for the government. That only happened – the testimony for the government was at trial. That testimony was part of what established Novak's responsibility for the large amount of past drug production at the lab. So what – when – when the AUSA at the detention hearing told Mr. Verga that the amount of actual methamphetamine and precursor P2P was much less than what had been thought – what she had thought prior to the detention hearing, then that did not – that did not preclude a finding that there had been years of production at the time. The – Ehrig had not yet testified as to the years of production and Novak's participation in that. Novak was telling Verga that he was innocent, that all he did was carry glassware over. And at that time, the chemist's testimony had not yet been developed. And it was the chemist's testimony about the production capacity at the lab that was central to the ultimate finding as to how much the drug amount that pushed – that determined the guideline sentence. But I think counsel for the petitioner takes a position that that chemist's testing should have been done by defense counsel by retention of an expert to find out what would be the probable amount produced by this lab in order to inform his client as to the amount of years he would be facing. But with the client telling Mr. Verga that he didn't participate at all, much less – much less during the February – That's not the first time that such a client would have said I had nothing to do with it. Some other dude did it, right? So, I mean, that doesn't foreclose the duty of counsel for the defense to do an independent investigation, does it, because his client says I didn't do it? No. And there's no showing that the – that Mr. Verga didn't view the tapes and make his assessment as to the overall size of the lab. He was in the same position as the co-defendant Whitman's counsel, who also didn't hire an independent expert. And he was in the same position, actually, as the trial AUSA, who made an offer which would have bound the United States to a 10-year sentence based on the preliminary view as to the lab. This was pre-apprendi so that the parties didn't have to front load this amount argument. This was something that would come in at sentencing. But as the case developed for the prosecution and as the trial was put on, that's when testimony came in about Novak's responsibility for – So you say that since the government hadn't gotten the chemist to test at that time to see what the production capacity of the meth lab was, and since Dearden hadn't, as you say, flipped, the prosecution was in the same position as was the defendant. They didn't do any further testing before they offered the 10 years, right? That's correct. They were willing to bind the government to a 10-year sentence. Every signal was that the defendant was – every signal to Mr. Verga was the defendant was claiming his innocence, he was going to trial. And despite the opinion that – of experienced defense counsel signing declarations in this case that over time a defense counsel can convince a client who initially claims innocence to change his plea to guilty in the face of substantial evidence, there's also the realism that the more that a defense attorney pushes on something that the client doesn't want to hear, the more risk there is that the client will fire the attorney, stop trusting the attorney, stop communicating with the attorney. And so there's a balance. Was there an evidentiary hearing on this? Was there an evidentiary hearing on the ineffective assistance of counsel claim? Yes, and Mr. Verga testified at that. And, in fact, he testified that when he brought up the idea of a plea that Mr. Novak was upset. Going on to the – Any plea? Any plea, yes. Going on to the prejudice prong, here the claim of innocence was it was adamant. It was consistently asserted over the course of the case, and it was a blanket claim of innocence. So those three factors really distinguish this case from the Second Circuit cases that the defendant has cited. Berea, the defendant was reluctant to plead guilty because he was embarrassed about what his children would think. And also the defense attorney, although he thought acquittal was impossible, he said he didn't even tell that to the defendant. What about the declaration from the defendant and his relatives? I think the magistrate found those to be self-serving. The district court indicated that he didn't find the post-sentencing claims credible because there was a 180-degree turn in the position that Mr. Novak had in this case. The evidentiary hearing focus was on the testimony of Mr. Verga. And Mr. Verga made clear in no uncertain terms that the defendant was adamant, consistent, didn't want to hear about a plea. And his claim of innocence. Now, excuse me. I hate to interrupt, but since your time is running out, I'd like to ask about the conflict Mr. Verga had. And I noticed in the blue brief, 21 to 26, 23, 24, he knew an awful lot. He had discussions which would surely have led him to be aware of his conflict. What is your response to that? Well, I think it's and if you look at Mr. Verga's testimony, he believed, and it was true, that his client, Derda, was cooperating in the Estate case. Estate was not a member of the misfits. And the focus of that cooperation was on Mr. Estate. Mr. Novak's case was entirely different from the Estate case. The ---- But there were some clear connections. Well, I think the connection was that the AUSA, who was not the AUSA in the Novak case, the AUSA and the grand jury asked some questions here and there about the Misfits Motorcycle Club. The amount of testimony about Mr. Novak took up about half a page and 70-some pages of grand jury testimony. Each time that the prosecutor went off on a tangent with respect to other people within the Misfits Motorcycle Club other than Mr. Derda, the cooperator, he always brought it back to Mr. Estate. And Mr. Verga testified that he attended some of the debriefs to make himself aware of what was going on with respect to substantial assistance. And he testified, you know, Novak didn't come up. He didn't see any connection, and he didn't know of any connection. There's absolutely no evidence in the record that would support a finding that Mr. Verga lied in his testimony about this. The plain fact is that he didn't see the ---- he didn't know of any connection between the cases. He didn't see that. Therefore, it didn't influence him in what he was doing. That extra step isn't there first because the first step wasn't there second because he testified that he was not influenced. And thinking with that, the government would request that the panel affirm the denial of the motion. Thank you. Thank you, counsel. Rebuttal. Counsel, I do stand corrected regarding your brief, that the point was more refined I didn't hear it or argument, but you did make the point of your brief. So I apologize for stating that it wasn't there. It is there. Thank you, Your Honor. That eliminates one thing I was going to do. A couple of quick corrective things. Counsel said that the lab technician's work had not been refined. It is true that there wasn't a final report, but at page 4 of the complaint, which we discussed earlier, the same lab technician talks about the volume of P2P that this lab could produce at page ER4. So it was very clear to counsel how big this lab was. The absence of an apprendi issue is meaningless because it had everything to do with the penalty. The reality is that counsel never even looked at the evidence and admitted as much at the evidentiary hearing. He never went and looked at the DEA evidence in the case. Had he done so, he would have known what his client was facing. In terms of prejudice, I find it unfathomable that the disparity in sentencing is not considered in evaluating prejudice, and it wasn't by the district court. To say somebody would not have ever pleaded guilty when he didn't know that he was facing at least double the amount of jail time, I think is just fallacious. That's one factor, but it's not the only factor, is it, counsel? It is not, Your Honor. It's not the only factor. But I think under the Second Circuit cases that this Court relied upon in Leonti, what we see is that the equation ought to be in the face of a claim by the defendant that he would have pleaded guilty. A disparity should be seriously considered by the court. And in Pham, that was his view. Don't you agree that's a little self-serving after the sentence has been imposed, and we have to look at how adamant he was about going to trial before the conviction? I think you do. I think you're right, Your Honor. But I think that what you also have to look at is people do that when they think they have nothing to lose. Bear in mind that this man was offered 10 years, and his lawyer told him that if you lose a trial, you're going to get 10 to 12 and a half. Now, when somebody gets told the price tag on a trial is 10 to 12 or 14 years, that changes everything. And that's what these declarations are about. That's common sense, and that's the reality of criminal practice. I understand your argument. Thank you, counsel. Thank you very much, Your Honor. Thank you to both counsel. The case just argued is submitted for decision by the Court.
judges: D.W. Nelson, Rawlinson, Bea